# Supreme Court of Florida

_____

No. SC2023-1708

_____

**IN RE: JUDICIAL CIRCUIT ASSESSMENT.**

December 21, 2023

PER CURIAM.

The Florida Constitution requires this Court to certify its findings and recommendations to the Legislature if the Court finds that there is a need to increase, decrease, or redefine judicial circuits. This year, aided by an assessment committee, we undertook a review focused narrowly on whether there is a need to consolidate (i.e., decrease the number of) judicial circuits. As explained below, we do not find that there is a need to consolidate judicial circuits at this time.

Our constitution assigns the Legislature, subject to certain procedural requirements, the responsibility to divide the state into judicial circuits following county lines. Art. V, §§ 1, 9, Fla. Const. The constitution does not fix the number of circuits. Florida has

had 20 judicial circuits since 1969, their boundaries unchanged in that time.

This Court's role in the process of making decisions about the number and boundaries of the judicial circuits is set out in article V, section 9 of the constitution. That provision requires our Court to have adopted a rule containing uniform criteria for the determination of the need to change the circuits. Since 2013, those criteria have been embodied in rule 2.241 of the Florida Rules of General Practice and Judicial Administration. They are: effectiveness; efficiency; access to courts; professionalism; public trust and confidence; and other factors as are regularly considered with respect to the need for additional judges. Fla. R. Gen. Prac. & Jud. Admin. 2.241(c).

Article V, section 9 requires our Court to certify findings and recommendations to the Legislature if we find the existence of a need to change the circuits. Rule 2.241 contemplates that the Court will recommend changes only when adverse circumstances present a "compelling need" for change or when the judicial process would be "improved significantly" by a change. Fla. R. Gen. Prac. & Jud. Admin. 2.241(b). Indeed, the rule advises the Court to

consider "less disruptive adjustments" before finding that a change in circuits is needed. *Id.*

Prompted by a legislative inquiry, our Court this year agreed to study whether there is a need to consolidate the circuits. We appointed an assessment committee and asked it to study and make recommendations limited to evaluating whether consolidation is needed. Committee members included a district court judge as chair, multiple circuit judges, a county judge, a state attorney, a public defender, a clerk of court, and two members of The Florida Bar's Board of Governors. Over its five-month existence, the committee met nine times, held public hearings, conducted surveys of practitioners and the public, and evaluated qualitative and quantitative data about the operation of Florida's trial court system. The committee's final, written report (less the appendix) is attached to this opinion.

By a unanimous vote, the committee found "that no need for consolidation exists and that the judicial process would not be improved by consolidation." Informed by the work of a subcommittee that studied the potential fiscal impact of consolidation, the full committee concluded that consolidation was

unlikely to save money in the trial court system. In addition, extensive public input led the committee to conclude that consolidation would not enhance public trust and confidence in the judicial process.

The committee did identify a need for the trial court system to achieve greater uniformity in technology and court processes. But the committee concluded that circuit consolidation would not necessarily help in those areas. For example, consolidation would not directly affect county-level variations in technology. The committee also noted that reforms intended to promote greater uniformity and transparency in trial court practices are already underway.

We have considered the committee's report and recommendation. And we ourselves have evaluated the issues relevant to consolidation, guided by the rule 2.241 framework. Based on the committee's findings and recommendations and on our own independent judgment, we do not find that there is a need to consolidate Florida's judicial circuits.

The Court is grateful for the committee's hard work and for its thorough and thoughtful report. We also thank every court system

user or member of the public who submitted comments or information to the committee. Finally, we appreciate the Legislature's interest in and support of the court system. What we learned through this process will undoubtedly help us to better serve the people of our State.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.

Original Proceeding – Judicial Circuit Assessment

# Judicial Circuit Assessment Committee

# Final Report and Recommendation

December 1, 2023

# Table of Contents

Judicial Circuit Assessment Committee Members ................................................................. iii

Executive Summary ...................................................................................................................1

I. Background............................................................................................................................2

    A. Structure of the Court System ......................................................................................2

    B. Assessment Committee Formation ...............................................................................4

    C. History of Judicial Circuit Alignment .........................................................................7

II. Methodology........................................................................................................................9

    A. Committee Meetings ....................................................................................................10

    B. Data Reviewed by Committee ....................................................................................14

        *1. Circuit Profiles*..........................................................................................................15

        *2. Case-Activity Data* ...................................................................................................15

        *3. Data Aligned with Rule Criteria*............................................................................15

        *4. Fiscal and Resource Data*.........................................................................................16

    C. Outreach.........................................................................................................................17

        *1. Liaison and Written Communications*....................................................................17

        *2. In-Person Hearings* ..................................................................................................18

        *3. Assessment Surveys*..................................................................................................18

    D. Analysis of Rule 2.241 Criteria....................................................................................20

III. Findings.............................................................................................................................21

    A. Input Received on Consolidation: Public Hearings, Written Communication, and Surveys...............................................................................................................................21

    B. Circuit Analyses under Rule 2.241 Criteria...............................................................22

        *1. Effectiveness* .............................................................................................................23

        *2. Efficiency*...................................................................................................................25

        *3. Access to Courts*........................................................................................................25

        *4. Professionalism*.........................................................................................................26

        *5. Public Trust and Confidence*...................................................................................26

        *6. Additional Criteria* ..................................................................................................27

    C. Fiscal Impact..................................................................................................................28

    D. Consideration of Less Disruptive Adjustments to Consolidation ...........................29

    E. Misconceptions on Effects of Consolidation ............................................................30

    F. Suggestions Beyond the Scope of the Charges .........................................................31

IV. Recommendation ................................................................................................. 31

Appendix ................................................................................................................. 31

# Judicial Circuit Assessment Committee Members

The Honorable Jonathan D. Gerber, Chair
Appellate Judge, Fourth District Court of Appeal

The Honorable Stacy M. Butterfield
Clerk of the Circuit Court and Comptroller, Polk County

The Honorable Keith A. Carsten
Circuit Court Judge, Ninth Judicial Circuit

The Honorable Shawn Crane
Chief Judge, Sixth Judicial Circuit

Mr. W. Braxton Gillam, IV
Attorney at Law, Jacksonville

The Honorable Glenn Kelley
Chief Judge, Fifteenth Judicial Circuit

The Honorable Christopher Kelly
Circuit Court Judge, Seventh Judicial Circuit

The Honorable Robert W. Lee
County Court Judge, Broward County

Mr. Laird A. Lile
Attorney at Law, Naples

The Honorable Carlos J. Martinez
Public Defender, Eleventh Judicial Circuit

The Honorable Diana L. Moreland
Chief Judge, Twelfth Judicial Circuit

The Honorable Melissa W. Nelson
State Attorney, Fourth Judicial Circuit

The Honorable Linda L. Nobles
Circuit Court Judge, First Judicial Circuit

The Honorable Margaret O. Steinbeck
Circuit Court Judge, Twentieth Judicial Circuit

Staff support provided by the Office of the State Courts Administrator.

# Executive Summary

*In re: Judicial Circuit Assessment Committee,* Fla. Admin. Order No. AOSC23-35 (June 30, 2023), established the Judicial Circuit Assessment Committee (Committee) to evaluate whether a need exists to consolidate Florida's judicial circuits in accordance with Florida Rule of General Practice and Judicial Administration 2.241. AOSC23-35 directed the Committee to evaluate the judicial circuits based on the six criteria in Rule 2.241: effectiveness, efficiency, access to courts, professionalism, public trust and confidence, and other factors that are regularly considered when determining a need for additional judges.

The number and boundaries of judicial circuits in Florida have remained unchanged since 1969. Although the Florida Supreme Court has not recently created a committee to study the boundaries of judicial circuits, chief judges regularly have an opportunity to recommend increasing, decreasing, or redefining judicial circuits through the Supreme Court's process of certifying the need for additional judges and circuit changes under Florida Rules of General Practice and Judicial Administration 2.240 and 2.241.

During the Committee's five-month term, the Committee met nine times; seven meetings were conducted by public videoconference, and two meetings were held in person, during which the public was invited to address the Committee. The Committee solicited a broad range of input from judges, attorneys, justice system stakeholders, legal professionals, and the public via survey instruments. Over the course of its assessment, the Committee considered a wide variety of data, public testimony, written correspondence, survey responses, and the results of other outreach. The Committee relied on quantitative and qualitative information as well as its collective judgment as judges and justice system stakeholders to evaluate the circuits according to the criteria established in Rule 2.241.

The Committee did not identify any justification to support consolidation, and observed significant opposition to consolidation. The majority of commentary suggested that consolidation would harm public trust and confidence.

The Committee concluded the assessment was a valuable exercise for the judicial branch, as well as other justice system entities. Reviewing input from members of the public and professionals who work in the court system, and analyzing myriad data on court operations, helped the Committee consider ways to improve services to court users and further the judicial branch's vision of accessible, fair, effective, responsive, and accountable justice.

While the assessment did not reveal a need warranting consolidation, the assessment did identify challenges to the judicial circuits that the Committee determined could be addressed through less disruptive adjustments than consolidation.

As a result of its assessment, the Committee unanimously voted to recommend against consolidation of any judicial circuits.

# I. Background

## A. Structure of the Court System

The Florida court system is comprised of the Supreme Court, district courts of appeal, circuit courts, and county courts. A "judicial circuit" encompasses the circuit and county courts that fall within the geographic boundaries of the judicial circuit. Each layer of the judicial branch plays a distinct role in providing justice across the state.

The Florida Supreme Court is the highest appellate court in Florida,[1] and its jurisdiction is prescribed in the Florida Constitution.[2] Certain matters, including review of orders imposing the death penalty, must be reviewed by the Supreme Court.[3] On the other hand, the Supreme Court exercises discretionary review over certain other categories of judgments, decisions, and writs.[4] The chief justice is the chief administrative officer of the judicial branch and is responsible for dispatching the business of the branch and directing implementation of policies and priorities as determined by the Supreme Court.[5] In this role, it is not uncommon for the chief justice to issue an administrative order establishing a committee or workgroup to assist the Court in implementing branch-wide policies and initiatives.[6]

---

[1] *See,* Art. V, § 1, Fla. Const. (1968); § 454.021(2), Fla. Stat. (2023).

[2] Art. V, § 3(b), Fla. Const. (1968).

[3] Art. V, § 3(b)(1)-(2), Fla. Const. (1968).

[4] Art. V, § 3(b)(3)-(9), Fla. Const. (1968).

[5] Art. V. § 2(b), Fla. Const. (1968); Fla. R. Gen. Prac. & Jud. Admin. 2.205(a)(2).

[6] *See, e.g., In re: Judicial Management Council Workgroup on Trial Court Technology Strategies,* Fla. Admin. Order No. AOSC22-80 (Oct. 28, 2022), https://supremecourt.flcourts.gov/content/download/851780/file/ AOSC22-80.pdf; *In re: Workgroup on Sanctions for Vexatious and Sham Litigation,* Fla. Admin. Order No. AOSC21-62 (Dec. 9, 2021), https://supremecourt. flcourts.gov/content/download/813326/ file/AOSC21-62.pdf; *In re: Workgroup on Improved Resolution of Civil Cases,* Fla. Admin. Order No. AOSC19-73 (Oct. 31, 2019), https://supremecourt.flcourts.gov/content/download/ 644645/file/AOSC19-73.pdf.

The district courts of appeal, as established by the Constitution, serve each appellate district established by the Legislature.[7] The state currently is divided into six appellate districts, with each district comprised of judicial circuits as designated by statute.[8] The district courts review final judgments and certain non-final orders from trial courts and governmental entities.[9] The fundamental reasons for appeals from trial courts are to correct harmful errors on review by a multi-judge panel of experienced judges and to promote clarity and consistency in the law by publishing opinions that set forth the relevant facts of the case and the proper application of the law to those facts.[10]

The Constitution provides that a circuit court shall be established to serve each judicial circuit established by the Legislature.[11] Since 1969, the state has been divided into twenty judicial circuits.[12] Some judicial circuits are made up of multiple counties.



Circuit court jurisdiction is established by statute.[13] Circuit court jurisdiction includes felonies, family law, juvenile delinquency and dependency, probate, and civil disputes involving more than $50,000.[14]

---

[7] Art. V, §§ 1, 4(a), Fla. Const. (1968).

[8] § 35.01, Fla. Stat. (2023).

[9] Art V, § 4(b), Fla. Const. (1968).

[10] Padovano, Philip J., Functions of the Court, 2 Fla. Prac., Appellate Practice § 7:1 (2023 ed.).

[11] Art. V, §§ 1, 5(a), Fla. Const. (1968).

[12] *See* § 26.021, Fla. Stat. (2023); § 26.01, Fla. Stat. (1969).

[13] § 26.012, Fla. Stat. (2023).

[14] § 34.01, Fla. Stat. (2023).

The Constitution establishes a county court in each of Florida's sixty-seven counties.[15] County court jurisdiction is established by statute.[16] County court jurisdiction includes misdemeanors and civil disputes involving $50,000 or less.[17]

## B. Assessment Committee Formation

By a letter dated June 15, 2023, Speaker of the Florida House of Representatives Paul Renner asked the Florida Supreme Court to consider the merits of consolidating Florida's judicial circuits as part of the Court's analysis of the need to increase, decrease, or redefine circuits.[18] Speaker Renner noted that the boundaries of Florida's judicial circuits have remained unchanged for decades despite significant population and demographic changes during that timeframe. The Speaker suggested that consolidation of circuits may lead to greater efficiencies and uniformity in judicial processes. The Speaker also suggested that consolidation may lead to substantial cost savings, through enhanced economies of scale in the back-office operations of the judiciary.

The judicial branch annually assesses the need for additional judges under Article V, section 9 of the Florida Constitution, which requires the Supreme Court to certify such need to the Legislature for further action.[19]

---

[15] Art. V, § 6(a), Fla. Const. (1968).

[16] Art. V, § (6)(b), Fla. Const. (1968); § 34.01, Fla. Stat. (2023).

[17] *Id.*

[18] A copy of Speaker Renner's letter is available online at the following link: https://www.flcourts.gov/content/download/872807/file/Assessment%20Committee%2007-14-2023%20Final%20Meeting%20Packet.pdf%23#page=9.

[19] *See In re: Certification of Need for Additional Judges*, 353 So. 3d 565 (Fla. 2022); *In re: Trial Court Judicial Needs Assessment Committee*, Fla. Admin. Order No. AOSC22-77 (Oct. 20, 2022), https://supremecourt.flcourts.gov/content/download/851320/file/AOSC22-77.pdf. Part of the process for the certification of need for additional judges involves a detailed time study to determine case weights. Case weights are generally reassessed every five years. *In re: Commission on Trial Court Performance and Accountability*, Fla. Admin. Order No. AOSC14-40 (July 2, 2014), https://supremecourt.flcourts.gov/content/download/645011/file/AOSC14-40.pdf; *In re: Commission on Trial Court Performance Accountability*, Fla. Admin. Order No. AOSC22-36 (July 28, 2022), https://supremecourt.flcourts.gov/content/download/844310/file/AOSC22-36.pdf. The most recent case weight assessment was delayed due to the COVID-19 pandemic.

Article V, section 9 also establishes a certification process to determine the need for increasing, decreasing, or redefining appellate districts and judicial circuits. Specifically, the constitutional framework provides:

> The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need. Upon receipt of such certificate, the legislature, at the next regular session, shall consider the findings and recommendations and may reject the recommendations or by law implement the recommendations in whole or in part; provided the legislature may create more judicial offices than are recommended by the supreme court or may decrease the number of judicial offices by a greater number than recommended by the court only upon a finding of two-thirds of the membership of both houses of the legislature, that such a need exists. A decrease in the number of judges shall be effective only after the expiration of a term. If the supreme court fails to make findings as provided above when need exists, the legislature may by concurrent resolution request the court to certify its findings and recommendations and upon the failure of the court to certify its findings for nine consecutive months, the legislature may, upon a finding of two-thirds of the membership of both houses of the legislature that a need exists, increase or decrease the number of judges or increase, decrease or redefine appellate districts and judicial circuits.[20]

Additionally, the Florida Constitution expressly authorizes the Legislature to divide the state into judicial circuits following county lines.[21] The current judicial circuit boundaries are codified in section 26.021, Florida Statutes (2023).

As part of the constitutional certification process, the Supreme Court is required to establish, by rule, uniform criteria for determining, among other things, the need to increase, decrease, or redefine judicial circuits.[22] The

---

[20] Art. V, § 9, Fla. Const. (1968).
[21] Art. V, § 1, Fla. Const. (1968).
[22] Art. V, § 9, Fla. Const. (1968).

uniform criteria are set forth in Florida Rule of General Practice and Judicial Administration 2.241(c),[23] which requires the Supreme Court to evaluate the judicial circuits under the following six criteria: effectiveness, efficiency, access to courts, professionalism, public trust and confidence, and other factors that are regularly considered when making a determination with respect to the need for additional judges.[24]

Rule 2.241 also authorizes the creation of an assessment committee and establishes a process to assist the Supreme Court in certifying its findings and recommendations to the Legislature. The rule requires the assessment committee to engage in discussions with chief judges, district and trial court representatives, court budget commissions, The Florida Bar, and the public.

After receiving Speaker Renner's letter, Chief Justice Carlos G. Muñiz established the Judicial Circuit Assessment Committee by issuing *In re: Judicial Circuit Assessment Committee*, Fla. Admin. Order No. AOSC23-35 (June 30, 2023), and charged the Committee with evaluating the need to consolidate Florida's judicial circuits.[25] The Chief Justice appointed fourteen members to the committee, including one appellate court judge as chair, seven circuit court judges, one county court judge, one clerk of court, one public defender, one state attorney, and two private attorneys who serve on The Florida Bar Board of Governors.

The administrative order required the Committee to assume that district court of appeal boundaries would remain unchanged, and allotted the Committee approximately five months to complete the evaluation, with final recommendations due to the Chief Justice by December 1, 2023. In addition to the outreach required under Rule 2.241, the administrative order directed the Committee to confer with other relevant entities within the justice system, as deemed appropriate.

---

[23] Florida Rule of General Practice and Judicial Administration 2.241 is available online at the following link: https://www-media.floridabar.org/uploads/2023/11/2024_04-OCT-Florida-Rules-of-General-Practice-and-Judicial-Administration-10-19-2023.pdf#page=71.

[24] The criteria used to determine the need for additional judges are set forth in Florida Rules of General Practice and Judicial Administration 2.240(b)(1) and (c).

[25] Florida Administrative Order No. AOSC23-35 is available online at the following link: https://supremecourt.flcourts.gov/content/download/872183/9705363.

## C. History of Judicial Circuit Alignment

The Committee's assessment was informed by past reports, including a 1986 Supreme Court study on the need to redefine judicial circuits,[26] a 1991 report from the House of Representatives on judicial circuits,[27] and a 2019 report from the Legislature's Office of Program Policy Analysis and Government Accountability on judicial boundaries and workload,[28] two of which included detailed chronologies on circuit boundary changes over time.

The 1991 House Report and the OPPAGA Report acknowledge that Florida has been divided into distinct judicial circuits since it became part of the Union in 1845.[29] The configuration of these circuits fluctuated significantly over the years, ranging from a minimum of four circuits in 1845 to a peak of twenty-eight circuits in 1927.[30] The 1991 House Report notes that circuits have been adjusted more than eleven times to accommodate population surges, settlement patterns, and the flow of litigation in Florida courts.[31] The most recent realignment occurred in 1969 when the court system was configured to its current composition of twenty circuits.[32]

The OPPAGA Report and the 1991 House Report state that the initial formation of judicial circuits closely mirrored the population distribution across the state and subsequent subdivisions accommodated population growth.[33] Southeast Florida, for example, began as a single circuit encompassing nearly the entire eastern coastline south of St. Augustine.[34] This singular circuit eventually evolved into seven distinct circuits as the region experienced

---

[26] *Final Report,* The Florida Supreme Court's Commission to Study the Need for Increased Appellate Districts and for Redefining Judicial Circuits, January 1986 [hereinafter "*1986 Final Report*"].

[27] *A Report on the Judicial Circuits of Florida,* Florida House of Representatives Committee on Judiciary, September 1991 [hereinafter "*1991 House Report*"].

[28] Office of Program Policy Analysis and Government Accountability, *Florida's Judicial Boundaries and Workload* (2019) [hereinafter "*OPPAGA Report*"] (available at https://oppaga.fl.gov/Documents/Reports/19-06.pdf).

[29] *1991 House Report, supra* note 27 at 4; *OPPAGA Report, supra* note 28 at 5. *See also* Art. V, § 5, Fla. Const. (1838).

[30] *OPPAGA Report, supra* note 28, at 5.

[31] *1991 House Report, supra* note 27, at 5.

[32] *See* § 26.021, Fla. Stat. (2023); *see also* Ch. 69-220, §§ 1-2, at 873, Laws of Florida (1969).

[33] *See 1991 House Report, supra* note 27, at 5; *OPPAGA Report, supra* note 28, at 6.

[34] *See 1991 House Report, supra* note 27, at 39-48; *OPPAGA Report, supra* note 28, at 6.

population growth.[35] Similarly, the development of the southwest coast led to an increase in the number of circuits. What was initially a single expansive circuit spanning from Tampa Bay to Naples is now five separate circuits, covering the same geographic region.[36]

The 1991 House Report further states that sparse documentation exists to explain the historical or contemporary layout of the judicial circuits.[37] However, when examined analytically, it appears that the settlement of the state, coupled with the differing provisions of the state's constitutions,[38] played a significant role in how the current circuit alignment developed.[39]

Several amendments to the Florida Constitution have influenced circuit boundary alignment over time. Initially, the Constitution prescribed a specific quantity of circuits,[40] but subsequent amendments allowed for "convenient" circuits, which allowed for a variable number of circuits.[41] In 1885, the Constitution reverted to a predetermined number of circuits;[42] however, this figure remained fluid and, through subsequent constitutional amendments, expanded from the initial seven circuits outlined in the 1885 Constitution to a total of twenty-eight circuits by 1927.[43] The 1991 House Report indicates that the creation of circuits often paralleled the establishment of new counties by the Legislature,[44] which were not merged with existing circuits but rather established as single-county circuits because these new counties were often not geographically contiguous.[45]

As explained in the 1991 House Report, an amendment was made to the 1885 Constitution in 1934, providing for the establishment of fifteen judicial circuits, each with a minimum population of 50,000 persons.[46] This constitutional amendment led to the realignment of the circuits, and small

---

[35] *Id.*

[36] *See* Art. VI, § 7, Fla. Const. (1868); § 26.021, Fla. Stat. (2023).

[37] *1991 House Report, supra* note 27, at 5.

[38] *See, e.g.,* Art. V, § 5, Fla. Const. (1838); Art. V, § 4, Fla. Const. (1861); Art. VI, § 7, Fla. Const. (1868); Art. V, §§ 8, 10, Fla. Const. (1885); Art. V, § 45, Fla. Const. (1934).

[39] *OPPAGA Report, supra* note 28, at 6.

[40] Art. V, § 5, Fla. Const. (1838).

[41] *See, e.g.,* Art. V, § 4, Fla. Const. (1861); Art. V, § 4, Fla. Const. (1865).

[42] Art. VI, §§ 8, 10, Fla. Const. (1885).

[43] *OPPAGA Report, supra* note 28, at 6.

[44] *1991 House Report, supra* note 27, at 5.

[45] *Id.*

[46] Art. V, § 45, Fla. Const. (1934).

counties that previously stood together or alone were merged with larger counties to form new circuits.[47]

Since 1934, only four modifications to the circuit boundaries have occurred. In 1951, the Legislature divided the Eleventh Judicial Circuit, restricting it to Dade County, and concurrently established a new Sixteenth Judicial Circuit for Monroe County.[48] In 1963, the Legislature divided the Fifteenth Circuit, restricting it to Palm Beach County, and concurrently established a new Seventeenth Circuit for Broward County.[49] In 1967, the Legislature divided the Ninth Circuit into three circuits, leaving Orange and Osceola counties as the Ninth Circuit, creating a new Eighteenth Circuit encompassing Brevard and Seminole counties, and creating a new Nineteenth Circuit encompassing Indian River, Martin, Okeechobee, and St. Lucie counties.[50] Then, in 1969, the Legislature created the Twentieth Judicial Circuit, encompassing Charlotte, Collier, Glades, Hendry, and Lee counties.[51]

Between 1970 and 2018, Florida's population grew from 6.8 million to over 20 million residents.[52] During that time, three studies were conducted to analyze the configuration of judicial circuits.[53] Although the 1986 Final Report and the 1991 House Report examined potential circuit realignment or expansion, both reports ultimately determined that no need existed to redefine judicial circuits.[54]

## II. Methodology

In order to fulfill the charges of Administrative Order No. AOSC23-35, the Committee developed a workplan and methodology aimed at providing thoughtful consideration and careful study of its charges without any preconceived notion regarding whether a need exists to consolidate Florida's judicial circuits.[55] The methodology called for the Committee to conduct virtual

---

[47] Ch. 17085, § 1, at 697-698, Laws of Florida (1935).
[48] Ch. 26952, §§ 1-2, at 1189-90, Laws of Florida (1951).
[49] Ch. 63-470, §§ 1-2, at 1208-09, Laws of Florida (1963).
[50] Ch. 67-195, §§ 2-7, at 399-404, Laws of Florida (1967).
[51] Ch. 69-220, §§ 1-2, at 873, Laws of Florida (1969).
[52] *See OPPAGA Report, supra* note 28, at 9.
[53] *See OPPAGA Report, supra* note 28; *1991 House Report, supra* note 27; *1986 Final Report, supra* note 26.
[54] *See 1986 Final Report, supra* note 26, at 2-5; *1991 House Report, supra* note 27, at 19.
[55] The Committee's workplan is available online at the following link: https://www.flcourts.gov/content/download/1160955/file/Assessment%20Co mmittee%20November%2029%202023%20Meeting%20Packet.pdf#page=2.

meetings open to the public; hold hybrid in-person/virtual public hearings; review court, fiscal, and other relevant data; engage in outreach with the public, justice system partners, and other stakeholders for feedback; develop surveys for input on the Rule 2.241 criteria; and analyze the data and feedback received for each judicial circuit, based on existing district court of appeal boundaries.

## A. Committee Meetings

The Committee organized its meetings around several key elements, including data collection and analysis, survey review, receipt of written correspondence, consideration of input, and the development of findings and recommendations. The Committee met nine times. Seven meetings were conducted by videoconference and the public was given viewing access. Two meetings were in person, during which the public was invited to address the Committee in person or by videoconference.

Public engagement in the Committee meetings was significant. On average, 172 people registered to view the meetings conducted online. For the first in-person meeting in Orlando, 598 people registered to view the meeting online, and for the second in-person meeting in Tampa, 412 people registered to view the meeting online. In addition, a total of more than 100 people attended the meetings in Orlando and Tampa.

**July 14, 2023:** The Committee's first meeting served as a planning session where members discussed the Committee protocols, proposed timeline, and outreach methodology.[56] Members were provided with materials including copies of Administrative Order No. AOSC23-35; the letter from Speaker Renner; Florida Rule of General Practice and Judicial Administration 2.241; relevant constitutional and statutory provisions; maps of the judicial circuit boundaries; circuit profiles; a sampling of court-activity data from the Trial Court Statistical Reference Guide; and prior studies regarding judicial circuit and district court boundaries.[57] Initial outreach efforts involved assigning each Committee member a justice system partner to contact to obtain feedback on court performance and the potential need to consolidate circuits. The Committee also

---

[56] Minutes for the July 14, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/874460/file/ Assessment%20Committee%20August%204%202023%20Meeting%20Packet.p df#page=4.

[57] The materials for the July 14, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/872807/ file/Assessment%20Committee%2007-14-2023%20Final%20Meeting%20 Packet.pdf.

discussed obtaining additional data that would assist the Committee in reaching its ultimate findings and recommendation.

**August 4, 2023:** The Committee members discussed their outreach efforts, which encompassed various activities such as conducting informational meetings with stakeholders, establishing channels for future feedback, and facilitating open dialogue to gather initial insights from justice system partners regarding whether a need exists for circuit consolidation and perceived costs and benefits.[58] Committee members reviewed draft surveys presented by staff of the Office of the State Courts Administrator (OSCA) and suggested changes that were integrated into the surveys.[59] The Committee reviewed a sample analytical template drafted to assist the Committee in applying the data to each rule criterion. Members discussed different data elements that could be readily assembled to assist with the Committee's analysis. The chair appointed a subcommittee to assess the potential fiscal and resource impacts of consolidation.[60]

**August 25, 2023**: This meeting included a hybrid hearing at which members of the public provided comments in person in Orlando and remotely via Webex.[61] This meeting also was devoted to other Committee business.[62] Based on the public comments, the members provided recommendations for further areas of research. The Committee reviewed the updates to the analytical template and discussed whether the necessary data was readily available or could be

---

[58] Minutes for the August 4, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/876391/file/Judicial%20Circuit%20Assessment%20Committee%20August%2025,%202023,%20Meeting%20Materials.pdf#page=12.

[59] The materials for the August 4, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/874460/file/Assessment%20Committee%20August%204%202023%20Meeting%20Packet.pdf.

[60] The following Committee members served on the Fiscal and Resource Subcommittee: Clerk Butterfield, Chief Judge Kelley, State Attorney Nelson, Judge Nobles, Public Defender Martinez, and Judge Steinbeck, who served as Subcommittee chair.

[61] A summary of the comments provided at the August 25, 2023, Committee meeting is available online at the following link: https://www.flcourts.gov/content/download/879511/file/Assessment%20Committee%20September%2015%202023%20Meeting%20Packet%20FINAL.pdf#page=7.

[62] Minutes for the August 25, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/879511/file/Assessment%20Committee%20September%2015%202023%20Meeting%20Packet%20FINAL.pdf#page=4.

obtained within the timeframe allotted to complete the Committee's charges. The Committee also reviewed a list of information and data points that would be relevant to the operations of the public defenders and state attorneys.[63] Judge Margaret Steinbeck, the chair of the Fiscal and Resource Subcommittee, provided an update to the Committee, sharing the Subcommittee's goal to estimate the potential fiscal impact in relation to business operations that may experience cost savings, increased expenditures, or no impact. OSCA staff provided an overview of the distribution efforts for the surveys.

**September 15, 2023:** The Committee reviewed the most recent correspondence, and members shared feedback received from justice system partners.[64] The Committee studied the results of the two surveys, focusing on statewide tabulation of the multiple- and scaled-choice questions for each survey.[65] The members were also presented with six data packets compiled by OSCA staff based, in part, on members' suggestions. Staff summarized the data elements, sources, and how the data aligned with the rule criteria. The Fiscal and Resource Subcommittee provided an update, noting additional outreach to multiple justice system partners.

**September 29, 2023:** The Committee reviewed the most recent correspondence.[66] OSCA staff provided an update on the surveys, reviewing a portion of the summaries of the narrative responses.[67] The survey overviews

---

[63] The materials for the August 25, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/876 391/file/Judicial%20Circuit%20Assessment%20Committee%20August%2025, %202023,%20Meeting%20Materials.pdf.

[64] Minutes for the September 15, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/880320/ file/Assessment-Committee-September-29-2023-Meeting-Packet.pdf#page=4.

[65] The materials for the September 15, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/879 511/file/Assessment%20Committee%20September%2015%202023%20Meetin g%20Packet%20FINAL.pdf.

[66] Minutes for the September 29, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/881147/ file/Assessment%20Committee%20October%2013%20Public%20Hearing%20P acket%20(final%20for%20posting)_Redacted.pdf#page=4.

[67] The materials for the September 29, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/ 880320/file/Assessment-Committee-September-29-2023-Meeting-Packet.pdf. The supplemental materials for the September 29, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/ download/880346/file/JCAC-Prelimary-Report-on-Survey-for-Members-of-the-Public.pdf.

also contained specific suggestions for consolidation contained in the narrative responses. Members were given a refresher on the analytical template and were encouraged to utilize it while analyzing the data for each circuit. The Fiscal and Resource Subcommittee presented an overview of its findings, explaining that the findings were designed to provide information related to potential statewide impacts. The fiscal and resource impacts of any specific suggestions for consolidation would require further study.

**October 13, 2023:** The Committee conducted a hybrid hearing at which members of the public provided comments in person in Tampa and remotely via Zoom.[68] OSCA staff also provided a final report on the compilation of the narrative responses to the survey questions.[69] The chair encouraged members to begin formulating their thoughts so that deliberations could begin in earnest at the next meeting. Members were also provided with the most recent correspondence received.[70] The majority of the meeting was focused on receiving testimony from the public who appeared in person or on Zoom.[71]

**November 3, 2023:** This meeting focused on the development of findings and recommendations.[72] To assist the Committee in conducting its analysis, OSCA staff completed the analytical template for each judicial circuit based on individual conversations with all fourteen Committee members.[73] Organized by circuits within each district court of appeal, the analytical templates were

---

[68] A summary of the comments provided at the October 13, 2023, Committee meeting is available online at the following link: https://www.flcourts.gov/content/download/927785/file/JCAC-Meeting-Packet-11-3-23.pdf#page=7.
[69] Minutes for the October 13, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/927785/file/JCAC-Meeting-Packet-11-3-23.pdf#page=4.
[70] The materials for the October 13, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/881147/file/Assessment%20Committee%20October%2013%20Public%20Hearing%20Packet%20(final%20for%20posting)_Redacted.pdf.
[71] *See* footnote 68, *supra*.
[72] Minutes for the November 3, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/1042780/file/Assessment%20Committee%20November%2017%202023%20Meeting%20Packet.pdf#page=4.
[73] The materials for the November 3, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/927785/file/JCAC-Meeting-Packet-11-3-23.pdf. The supplemental materials for the November 3, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/934429/file/Consolication%20of%20Judicial%20Circuits%20Comments%20(FL%20Bar%20CLS).pdf.

reviewed under the Rule 2.241 criteria, highlighting both common and unique issues to each circuit. The Committee discussed their findings and went through each of the consolidation proposals submitted by survey respondents and which were within the parameters of the Committee's charges as outlined in Administrative Order No. AOSC23-35. Members weighed the benefits and concerns of each proposal and ultimately determined that any benefits of consolidation were outweighed by significant concerns. The Committee unanimously voted to recommend against consolidation of any judicial circuits.

**November 17, 2023:** At this meeting, the Committee reviewed the draft report prepared by OSCA staff based on the Committee's deliberations.[74] Committee members discussed revisions to the draft report and were encouraged to provide any additional revisions by the close of business on Monday, November 20, 2023.[75]

**November 29, 2023:** The Committee reviewed the revisions to the draft report, which included those discussed during the November 17, 2023, meeting, revisions provided by Committee members after the meeting, and technical edits made by OSCA staff.[76] The Committee unanimously approved the final report as revised, granting the chair and staff latitude to make technical or other non-substantive revisions.[77]

## B. Data Reviewed by Committee

In accordance with Florida Rule of General Practice and Judicial Administration 2.241, the Committee reviewed court statistics, projections, and other data to determine whether a need exists to consolidate judicial circuits.

---

[74] Minutes for the November 17, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/1160955/file/Assessment%20Committee%20November%2029%202023%20Meeting%20Packet.pdf#page=4.

[75] The materials for the November 17, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/1042780/file/Assessment%20Committee%20November%2017%202023%20Meeting%20Packet.pdf.

[76] Minutes for the November 29, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/1172661/file/JCAC%20meeting%20#8%20-%20minutes%2011-29-2023.pdf.

[77] The materials for the November 29, 2023, Committee meeting are available online at the following link: https://www.flcourts.gov/content/download/1160955/file/Assessment%20Committee%20November%2029%202023%20Meeting%20Packet.pdf.

### 1. Circuit Profiles

The Committee reviewed profiles of all twenty judicial circuits. The circuit profiles included information on overall case filings, dispositions, number of judges, population, and square mileage within each circuit.[78]

### 2. Case-Activity Data

The Trial Court Statistical Reference Guide is produced annually by the OSCA to compile and present statistical data related to trial court operations.[79] This annual report contains data regarding case filings, dispositions, charges, clearance rates, and jury trial dispositions. Select data from the Trial Court Statistical Reference Guide was provided to the Committee as detailed in section II.B.3. below.

### 3. Data Aligned with Rule Criteria

To facilitate the Committee's analysis, OSCA staff selected particular data elements from the list of elements discussed at the Committee's August 4 meeting, compiled the data, and aligned the data with the rule criteria.[80]

The data elements relevant to the "effectiveness" criterion[81] included the following: circuit criminal clearance rates, circuit civil clearance rates, circuit family clearance rates, circuit probate clearance rates, county criminal clearance rates, county civil clearance rates, and survey responses.[82]

With respect to the "efficiency" criterion,[83] the following data elements were provided to the Committee: overall clearance rates, open criminal cases, deployment of court case management systems, deployment of clerk case maintenance systems, and judicial e-filing implementation progress.

Regarding the "access to courts" criterion,[84] the Committee was provided the following data elements: courthouse locations and distances, E-Filing

---

[78] The circuit profiles are available online at the following link: https://www.fl courts.gov/content/download/874460/file/Assessment%20Committee%20Aug ust%204%202023%20Meeting%20Packet.pdf#page=72.

[79] The Trial Court Statistical Reference Guide is available online at the following link: https://www.flcourts.gov/Publications-Statistics/Statistics/ Trial-Court-Statistical-Reference-Guide.

[80] The data compilation presented to the Committee is available online at the following link: https://www.flcourts.gov/content/download/879511/file/ Assessment%20Committee%20September%2015%202023%20Meeting%20Pac ket%20FINAL.pdf#page=117.

[81] Fla. R. Gen. Prac. & Jud. Admin. 2.241(c)(1).

[82] The survey responses are more fully explained in section III. below.

[83] Fla. R. Gen. Prac. & Jud. Admin. 2.241(c)(2).

[84] Fla. R. Gen. Prac. & Jud. Admin. 2.241(c)(3).

Portal self-represented litigant account information, and DIY (Do It Yourself) Florida interview filings by county.

Data elements provided for the "professionalism" criterion[85] included: survey responses, continuing judicial education extension requests, trial court staff vacancies 180 days or longer, turnover in trial court positions, court staff participation in the Florida Court Personnel Institute,[86] and court staff participation in Institute for Court Management[87] courses.

For the "public trust and confidence" criterion,[88] the Committee reviewed: maps of the DCAs by circuit and county, circuit and county population and square mileage, and number of judges by circuit and county.

Finally, with respect to the "additional criteria" criterion,[89] which addresses factors considered when determining the need for additional judges pursuant to Florida Rules of General Practice and Judicial Administration 2.240(1)(b) and (c), the following data was provided to the Committee: county court judge assignments in circuit court, judges assigned to criminal and delinquency divisions, circuit criminal jury trial rates, circuit civil jury trial rates, county criminal jury trial rates, county civil jury trial rates, interpreter events by circuit, Baker Act filings, post-conviction relief motions, violation of probation hearings, and criminal justice profiles compiled by the Legislature's Office of Economic and Demographic Research.

### 4. Fiscal and Resource Data

The Fiscal and Resource Subcommittee evaluated the fiscal impact of consolidation on the trial courts, clerks of court, state attorneys, public defenders, local law enforcement, and other justice system partners.[90] The

---

[85] Fla. R. Gen. Prac. & Jud. Admin. 2.241(c)(4).

[86] The Florida Court Personnel Institute is a two- to four-day program tailored to the education needs of Florida's court employees and brings approximately 250 court personnel together from across the state to participate in programs that focus on topics such as purposes and responsibilities of the court, court communications, court outreach, customer service, and faculty training.

[87] The Institute for Court Management, founded by the National Center for State Courts, offers training and education for judicial branch personnel in the growing body of knowledge on court leadership and management concepts, case management, human resources management, the court performance standards, and other areas deemed critical to professional development.

[88] Fla. R. Gen. Prac. & Jud. Admin. 2.241(c)(5).

[89] Fla. R. Gen. Prac. & Jud. Admin. 2.241(c)(6).

[90] The Subcommittee's report is available online at the following link: https://www.flcourts.gov/content/download/880320/file/Assessment-Committee-September-29-2023-Meeting-Packet.pdf#page=221.

analysis was limited to estimating the statewide fiscal impact of consolidation on each identified justice system partner.[91] Subcommittee members engaged in outreach with the affected entities to obtain fiscal impact assessments, comments, and other supporting data, which was provided to the Committee.[92]

## C. Outreach

As directed by Administrative Order No. AOSC23-35, the Committee conferred with chief judges and other representatives of the courts, the Trial Court Budget Commission, The Florida Bar, and the public, as well as other justice system entities. To this end, the Committee pursued multiple avenues of outreach, including soliciting written comments and speaking at various civic forums, holding hearings to accept public testimony, and distributing surveys.

The public interest and engagement on the question of consolidation was extensive in all three areas of outreach. The engagement spanned the state and included professional and public interests.

### 1. Liaison and Written Communications

The chair assigned Committee members as liaisons to certain stakeholders to facilitate outreach.[93] Members were also instructed to share with the Committee any feedback received individually or through liaison activities.[94]

An email account was established for the Committee to receive written correspondence. All communications received were subsequently included in the next meeting materials packet for review by all members and any interested

---

[91] The Subcommittee's workplan contemplated conducting more granular circuit-by-circuit analyses in the event the Committee sought review of any specific proposals for consolidation. However, the Committee did not direct the Subcommittee to review any specific consolidation proposals.

[92] This outreach included the following entities: Florida Department of Children and Families, Florida Department of Corrections, Florida Department of Juvenile Justice, Florida Department of Law Enforcement, Florida Fish and Wildlife Conservation Commission, Florida Highway Patrol, Florida Police Benevolent Association, Florida Police Chiefs Association, Florida Sheriffs Association, Florida State Fraternal Order of Police, Justice Administrative Commission, and the Office of the Attorney General.

[93] The liaison assignments can be found in the minutes from the July 14, 2023, Committee meeting, available online at the following link: https://www.flcourts.gov/content/download/874460/file/Assessment%20Committee%20August%204%202023%20Meeting%20Packet.pdf#page=6.

[94] The meeting minutes referenced in section II.A. above reflect the feedback received by individual Committee members.

person.[95] In total, the Committee received 189 written comments, from state attorneys, public defenders, judges, chief judges, the Conference of Circuit Judges of Florida, police chiefs, sheriffs, county commissioners, sections of The Florida Bar, local bar associations, and the general public, among others. Eight of the submissions included resolutions from city councils, county commissions, and one circuit bar association.

Several Committee members presented information regarding the work of the Committee at various civic forums. Chief Judge Crane addressed the West Pasco, Clearwater, and St. Petersburg Bar Associations; Judge Gerber and Public Defender Martinez spoke with the Miami-Dade Bar Association; State Attorney Nelson and Mr. Gillam spoke with the Jacksonville Bar Association; and Judge Kelly met with the Putnam County, St. Johns County, and Volusia County Bar Associations. Additionally, Judges Lee and Kelly spoke with the Conference of County Court Judges of Florida, and Judge Carsten addressed the Conference of Circuit Judges of Florida.

### 2. In-Person Hearings

Meetings hosted in two centrally-located cities drew large audiences.[96] The first in-person hearing on August 25, 2023, was a hybrid hearing held at the Orange County Courthouse in Orlando and virtually on Webex. Forty-six individuals testified regarding consolidation of circuits. Of those forty-six, sixteen were public officials, including state attorneys, public defenders, state representatives, and one state senator.

The second in-person hearing on October 13, 2023, was also a hybrid hearing held at the Hillsborough County Courthouse in Tampa and virtually on Zoom. Fifty-seven individuals testified regarding consolidation of circuits. Of those fifty-seven, twenty-four were public officials, including state attorneys, public defenders, law enforcement officials, state and county representatives, judges, one chief judge, and one clerk of court.

### 3. Assessment Surveys

To obtain a broad range of input on the six criteria outlined in Rule 2.241, the Committee drafted and distributed two online surveys. The Survey of Court, Government, and Legal Professionals (Professional Survey) was

---

[95] Meeting materials, *supra* notes, 57, 59, 63, 65, 67, 70, 73, 75, and 77.
[96] A total of 103 speakers provided testimony at the public hearings. By comparison, the recent District Court of Appeal Workload and Jurisdiction Assessment Committee held a public hearing where only three individuals provided testimony. *See* District Court of Appeal Workload and Jurisdiction Assessment Committee, *Final Report and Recommendations* (2021), https://www.flcourts.gov/content/download/791118/file/dca-assessment-Committee-Final-Report.pdf.

developed for professional stakeholders who interact or practice in the court system.[97] The Survey for Members of the Public (Public Survey) was drafted with the court user in mind. The surveys were tailored to the rule criteria in a neutral fashion to obtain unbiased responses from these diverse populations. The Professional Survey relied on scaled-choice questions, which requested the respondent to agree or disagree with a statement on a five-point scale. The Public Survey utilized a more simplified scale using "yes," "somewhat," "no," and "don't know/no opinion." Both surveys provided respondents the opportunity to explain their previous answers using up to 2,000 characters per "free response" question.

The Florida Bar graciously facilitated distribution of the professional survey to all attorneys licensed in Florida via e-mail, while the Committee asked circuit court chief judges to share the survey with their respective judges and court staff. Staff of the Office of the State Courts Administrator (OSCA) also shared the instruments with several governmental agencies, professional associations, and similar organizations, including legal aid providers. The clerks of court agreed to provide a link to the surveys on their website. A dedicated webpage was created on the Florida Courts website (flcourts.gov), displaying prominent links to both surveys, and the surveys were further advertised through Florida Courts social media channels. The surveys were open to respondents on August 9, 2023, and were originally set to expire on September 1. However, the response period was extended to September 4 due to disruptions caused by Hurricane Idalia.

Nearly 7,000 survey responses were received. For the Public Survey, 2,087 completed responses were submitted. The Professional Survey generated 4,818 complete responses. Of those, 41% (1,995) of respondents identified themselves as "private attorney." Statistical analyses of the multiple- and scaled-choice questions for each survey were produced both on a statewide

---

[97] The Professional Survey solicited opinions from the following groups: chief judges, former chief judges, appellate court judges, circuit court judges, county court judges, senior judges, magistrates, hearing officers, DCA staff, trial court administrators, other trial court staff, clerks of the circuit court or clerk staff, state attorneys and assistant state attorneys, public defenders and assistant public defenders, criminal conflict or civil regional counsel (CCRC) and assistant CCRCs, other government attorneys, legal services or other non-profit attorneys, private attorneys, state government officials, county government officials, and law enforcement officials.

basis and for each circuit.[98] A statewide summary of the "free response" answers to narrative survey questions was also produced for each survey.[99]

### D. Analysis of Rule 2.241 Criteria

Under Rule 2.241, certification of the need to increase, decrease, or redefine judicial circuits may be established under two circumstances. First, the Supreme Court is required to certify such need when it determines that the judicial process is adversely affected by circumstances that present a compelling need for the certified change.[100] Second, the Court may certify such need when it determines that the judicial process would be improved significantly by the certified change.[101]

Ultimately, the Supreme Court is required to balance the potential impact and disruption caused by changes in the boundaries of judicial circuits against the need to address circumstances that limit the quality and efficiency of, and public confidence in, the judicial process.[102] Given the impact and disruption that can arise from any alteration in judicial structure, the Supreme Court is required to consider, prior to recommending a change in judicial circuits, less disruptive adjustments including, but not limited to, the addition of judges, the creation of branch locations, geographic or subject-matter divisions within judicial circuits, deployment of new technologies, and increased ratios of support staff per judge.[103]

The analytical template developed at the Committee's August 4 and 25 meetings served as a key tool in the Committee's analysis of the need to consolidate judicial circuits. The analytical template was designed to permit the Committee to uniformly evaluate each judicial circuit by applying relevant data to each rule criterion. Within the template, the factors for each of the six rule criteria were aligned with relevant data, as detailed in section II.B.3. above. The template assisted the members in conducting individual circuit analyses by encouraging the members to note any concerns after considering the data in light of a specific rule factor. A series of questions were presented to reach the

---

[98] OFFICE OF THE STATE COURTS ADMINISTRATOR, *JCAC Survey Data*, FL COURTS, https://www.flcourts.gov/Administration-Funding/Court-Councils-Commissions-and-Committees/Judicial-Circuit-Assessment-Committee/JCAC-Survey-Data (last modified Oct. 16, 2023).
[99] *Id.*
[100] Fla. R. Gen. Prac. & Jud. Admin. 2.241(b)(1).
[101] Fla. R. Gen. Prac. & Jud. Admin. 2.241(b)(2).
[102] Fla. R. Gen. Prac. & Jud. Admin. 2.241(b)(8).
[103] *Id.*

ultimate conclusion of whether on balance, any benefits of consolidation outweigh the potential impact or disruption.

All members provided feedback to OSCA staff on the circuits. With this foundational work complete, the full Committee evaluated all of the circuits during its November 3, 2023, meeting using templates which staff completed based on the members' input.[104]

# III. Findings

The Committee finds that no need for consolidation exists and that the judicial process would not be improved by consolidation. As a basis for these findings, the Committee considered myriad data points, survey responses, public testimony, and written correspondence, and relied on their collective judgment as judges and professionals in evaluating how the judicial circuits are functioning in relation to each rule criterion.

## A. Input Received on Consolidation: Public Hearings, Written Communication, and Surveys

The Committee finds that public input did not evidence support for consolidating judicial circuits. The public interest and engagement on the question of consolidation was extensive in all three areas of outreach. The engagement spanned the state and included professional and public interests. Notably, the public sentiment was resoundingly opposed to consolidating judicial circuits.

Over the course of two public hearings, 103 people provided testimony. Ninety-one of the 103 speakers at the public hearings expressed concerns about, or argued against, consolidation, while four spoke in favor of consolidation and ten referenced the merits of reviewing judicial circuit boundaries.[105] State attorneys and public defenders, through their respective associations or individually, opposed consolidation or expressed strong concerns about consolidation.[106] Out of the 189 written comments received, 155 were opposed to consolidation, with only four in favor. Twenty-seven

---

[104] All twenty circuit analytical templates are attached to this report as an appendix.

[105] These figures exceed 103 due to the multifaceted nature of the testimony.

[106] To remain neutral, Committee members State Attorney Nelson and Public Defender Martinez did not participate in the comments submitted by other state attorneys and public defenders. Letters from the State Attorneys and Public Defenders can be found in the meeting materials linked in footnotes 59, 63, 65, 70, and 75 *supra*. Links to the summaries of the comments received in person and by videoconference can be found in footnotes 61 and 68, *supra*.

commenters did not take a position on consolidation, and seven referenced the merits of reviewing judicial circuit boundaries.[107]

For the statewide Public Survey, when asked whether the six criteria in Rule 2.241 would be improved through consolidation, the percentage of responses stating the criteria would not be improved ranged from 87.2% to 93.5%. When the "don't know/no opinion" answers are removed from the statewide Professional Survey results, the highest percentage of respondents who believed consolidation would improve any of the six criteria was 2.6%. Below is a visual example of the statewide Public Survey and Professional Survey responses to the question of whether consolidation would improve the effectiveness of judicial circuits.



## B. Circuit Analyses under Rule 2.241 Criteria

Using the survey, oral comments, and written input on consolidation, as well as various court-related data, the Committee analyzed each of the twenty judicial circuits against the six criteria (along with the factors underlying each criterion) prescribed in Rule 2.241: effectiveness, efficiency, access to courts, professionalism, public trust and confidence, and additional factors regularly considered in determining the need for additional judges under Rule 2.240. For purposes of this analysis, the Committee grouped judicial circuits based on the geographical boundaries of each district court of appeal.[108] The map below

---

[107] These figures exceed 189 due to the multifaceted nature of the written comments.

[108] Administrative Order No. AOSC23-35 required the Committee to assume that existing DCA boundaries would remain unchanged.

illustrates the composition of the six district courts of appeal by judicial circuit, as prescribed in sections 35.02 through 35.044, Florida Statutes (2023).



The analytical templates referenced in section II.D. above, and attached to this report as an appendix, assisted the members in applying the relevant data and other information to the rule criteria for each judicial circuit. The information which the Committee reviewed for a particular criterion often applied to other criteria as well (e.g., clearance rates as relevant to effectiveness and efficiency).

The Committee finds that the judicial circuits are operating well. However, as summarized below, judicial circuits are facing various challenges or concerns affecting performance – with some of these being common across multiple circuits. The Committee also considered the potential causes of these challenges and concerns.

### 1. Effectiveness

In evaluating the effectiveness criterion, the Committee focused on historical clearance rates in six divisions: circuit criminal, circuit civil, circuit family, circuit probate, county criminal, and county civil. The Committee reviewed five years of data, finding that clearance rates were favorable or trending favorably over the period from fiscal year 2017-18 through fiscal year 2021-22. However, the Committee observed instances in which circuit court or county court clearance rates for certain divisions in a judicial circuit were below the statewide average and the court system's performance standards.

With respect to causation, the Committee observed that availability of sufficient resources is a significant factor affecting the ability of judicial circuits to operate effectively, efficiently, and in advancement of the criteria in Rule 2.241. For example, the Committee recognized that judicial and adjudicatory staff resources can affect the timely and efficient disposition of cases. The Committee further noted that clearance rates should be reviewed over multiple years for analytical and comparative purposes, because circumstance-specific anomalies can affect clearance rates in one year (e.g., the COVID-19 pandemic; a substantial number of judicial vacancies in a judicial circuit; hurricane-related closures; etc.).

Some speakers during the public comment sessions and some survey respondents noted the need for greater uniformity and consistency between and among the circuits. The Committee heard concerns about inconsistent procedures and technologies across judicial circuits, the existence of which affects court users who function in multiple circuits. These comments suggested that uniform court procedures and technologies would enhance the judicial system's effectiveness and efficiency. The Committee recognizes the potential benefit that enhanced uniformity could pose to the public, court users, and professionals, but concludes that less disruptive alternatives to consolidation exist to achieve enhanced uniformity. More specifically, the Committee observes that the issue of enhanced uniform court procedures has been addressed by the judicial branch through the Judicial Management Council's Workgroup on Judicial Practices in Trial Courts, which is more fully explained in section III.D. below.

Inconsistency in technology, the Committee found, is rooted in Florida's constitutional framework for funding the court system, under which counties are required to fund the cost of "communications services" for the trial courts – defined by statute to include hardware and software.[109] The Committee observed that a recently completed comprehensive study by the Judicial Management Council's Workgroup on Trial Court Technology Strategies found that inconsistencies among the judicial circuits in the deployment of case management systems are due in large part to funding inequities among counties.[110] The Committee notes that uniformity in technology would not result from consolidating judicial circuits because each of the state's sixty-seven county clerks of court has responsibility over the clerk's respective system for maintaining case records. Consolidation of judicial circuits would

---

[109] Art. V, § 14(c), Fla. Const. (1968), § 29.008(1), Fla. Stat. (2023).
[110] Jud. Mgmt. Council of Fla., *Workgroup on Trial Court Technology Strategies Final Report and Recommendations* (2023), https://www.flcourts.gov/content/download/881324/file/Final%20Report%20-%20Workgroup%20on%20Trial%20Court%20Technology%20Strategies.pdf.

have no effect on streamlining case management systems because consolidation would not alter county boundaries and jurisdiction.

## 2. Efficiency

The Committee observed instances of lower satisfaction – as reflected in the public and professional survey responses – for some circuits' performance against the Rule 2.241 efficiency factor of staying current with its caseload. However, the Committee observed that even in these instances, an overwhelming majority of respondents nevertheless did not support consolidation of judicial circuits as a means to enhance efficiency.

Rule 2.241 identifies, as an additional factor under the efficiency criterion, whether the circuit "uses its resources, case management techniques, and technologies to improve the efficient adjudication of cases." The Committee identified examples of circuits not being compliant in all counties with the latest standards for case management systems (i.e., the Court Application Processing System) as prescribed by the Florida Courts Technology Commission.[111] The Committee concluded that funding inequities among counties may contribute to a circuit's technological challenges and that consolidation of judicial circuits would not remediate this issue for the reasons described in section III.B.1. above.

## 3. Access to Courts

The Committee noted lower satisfaction, as reflected in the public and professional survey responses, for some circuits' performance against Rule 2.241 factors under the access to courts criterion – in particular making decisions of the court available in a timely and efficient manner and providing litigants, including self-represented litigants, with meaningful access to court. As noted with other criteria, however, respondents nevertheless did not support consolidation as a solution to concerns about access to courts.

The Committee received considerable input from the public indicating a concern that consolidation would negatively affect access to courts by requiring individuals to drive longer distances to participate in court activities. The Committee finds, however, that consolidation would not impact the public's access to the court system. As addressed in section III.E. below, consolidation would not affect the ability to prosecute cases or adjudicate civil claims in the

---

[111] The Court Application Processing System (CAPS) is an information technology system that provides judges and court staff with access to electronic case file information from a variety of sources. The CAPS Certified Functionality Map presented to the Committee is available online at https://www.flcourts.gov/content/download/879511/file/Assessment%20Committee%20September%2015%202023%20Meeting%20Packet%20FINAL.pdf#page=149.

county where the crime occurred, the county where the cause of action accrued, or the county where the property in litigation is located.[112] Further, consolidation would not result in closure of county courthouses. Thus, while members of the public might have to travel farther to observe court proceedings in a circuit with larger geography, they would not have to do so to enforce their rights.

### 4. Professionalism

Among the factors that Rule 2.241 prescribes under the professionalism criterion are judges' ability to participate in continuing judicial education and the circuit's ability to recruit and retain qualified staff. In analyses of these factors, the Committee considered, among other information, data on requests by judges for extensions of time in reporting compliance with continuing judicial education credit requirements. The small number of judges statewide who requested continuing judicial education credit extensions for 2019-2023 suggests that judges have adequate time and resources to participate in continuing judicial education and to stay current on the law.

With respect to recruitment and retention of qualified staff, the Committee noted difficulty in multiple circuits, as reflected in higher-than-average turnover rates or positions vacant more than 180 days. Members noted that the cost of living in some circuits contributes significantly to challenges in recruiting staff, as does the ability to offer competitive salaries. Further, state and national labor market conditions, which courts and justice system partners have limited ability to control, can increase turnover rates and cause delays in filling vacancies.

The Committee finds that consolidation in most instances would not resolve or would have no effect on these circuit challenges and, consequently, would not enhance professionalism. Specifically, staffing, like workload, is largely "county-centric," the Committee noted. Applications for staff vacancies tend to be drawn from the same county or general geographic area in which the position is headquartered. Thus, while consolidation would increase the number of counties in a given circuit, consolidation would not likely cause individuals to apply for positions in a county that is a significant distance from where they reside.

### 5. Public Trust and Confidence

This Rule 2.241 criterion focuses on whether the judicial circuit "fosters public trust and confidence given its geography and demographic composition."

This criterion was invoked by a significant number of survey respondents, individuals testifying during the public hearings, and persons

---

[112] *See, e.g.,* §§ 47.011, 47.021, 910.03, Fla. Stat (2023).

who submitted written comments. The general sentiment among those who discussed public trust and confidence argued that consolidation would diminish public trust and confidence. They noted the importance of a connection between the local community and judges, the state attorney, the public defender, and others involved in the judicial system.[113] Many also noted the dilution of geographic representation that would likely result from consolidation and expressed concerns that expanding the geographic and population size of a circuit would negatively affect local relationships to the judicial system.

In the survey responses, the Committee observed, for multiple circuits, comparatively lower satisfaction with the statement that the circuit attracts a diverse group of well-qualified applicants for judicial vacancies, including applicants from all counties within the circuit. However, members did not believe that consolidation would mitigate this concern.

As a related matter, the Committee observed that a judicial circuit nominating commission has nine members, each of whom is a resident of the territorial jurisdiction served by the commission.[114] Consolidation of judicial circuits would likely impact the geographic diversity in the membership of a commission, which may affect perceptions about a localized connection between the judiciary and the community (e.g., whether the commission for consolidated circuits reflects the counties in the expanded territorial jurisdiction).

The Committee finds that consolidation would not enhance public trust and confidence in the judicial system.

### 6. Additional Criteria

The sixth criterion under Rule 2.241 encompasses "other factors as are regularly considered when making a determination with respect to the need for additional judges under" Rules 2.240(b)(1) and (c). In addition to addressing the primary quantitative methodology for determining the need for additional judges, those Rule 2.240 provisions also address consideration of secondary factors affecting workload. Examples of these factors include the geographic size of a circuit and travel times between courthouses, prosecutorial practices

---

[113] *See In re Redefinition of Appellate Districts & Certification of Need for Additional Appellate Judges*, 345 So. 3d 703 (Fla. 2021) ("The 'primary rationale' for this recommendation 'is that creation of an additional DCA would promote public trust and confidence.'"). One of the factors under the "public trust and confidence" criterion of Rule 2.241 is the extent to which each court "handles its workload in a manner permitting its judges adequate time for community involvement."

[114] § 43.291, Fla. Stat. (2023).

and resources, availability of case-related support staff and case management practices, and caseload trends. As part of its analysis of this criterion, the Committee compiled information related to a number of the Rule 2.240 factors.

The Committee did not identify any significant concerns among the twenty circuits under this criterion.

## C. Fiscal Impact

The Fiscal and Resource Subcommittee,[115] undertook an extensive review of the potential fiscal impact[116] of consolidation on a statewide basis. The Subcommittee was cognizant that without knowing which judicial circuits might be consolidated, the Subcommittee could not truly know or appreciate the exact fiscal or other impacts of consolidation without further extensive analysis. The Subcommittee also recognized that consolidation could affect different entities in the justice system differently and could result in short-term and long-term impacts.

Benefitting from the extensive analysis of the Subcommittee, the Committee found that, on a statewide basis, judicial circuit consolidation would have an overall estimated neutral or no long-term fiscal impact as it relates to the work of the trial courts, clerks, and the majority of state agencies and local and state law enforcement. The Committee further determined that consolidation would have an overall estimated negative or adverse fiscal impact as it relates to the work of the state attorneys and public defenders. Short term, the Committee determined that consolidation would have an estimated negative fiscal impact on specific functional categories, such as technology, for the trial courts and clerks. These short-term negative impacts would be especially significant for the state attorneys and public defenders. Although the Committee recognized that consolidation could generate operational changes in areas such as filing practices, case-related activity, prosecutorial practices, and law enforcement activities that could result in cost savings or increases over time, these specific changes are neither readily predictable nor currently capable of measurement.

---

[115] The Subcommittee's report is available online at the following link: https://www.flcourts.gov/content/download/880320/file/Assessment-Committee-September-29-2023-Meeting-Packet.pdf#page=221.

[116] For the purposes of this report, a "positive fiscal impact" is one that results in a cost savings, and a "negative fiscal impact" is one that results in a cost increase.

## D. Consideration of Less Disruptive Adjustments to Consolidation

The Committee also considered the potential disruptive impacts of consolidation and, as directed by Rule 2.241, considered less disruptive adjustments to consolidation.

Disruption, and specifically disruption related to technology, was discussed frequently in public comment and written correspondence. The Committee found that judicial circuit consolidation would require integrating various and different technologies, resulting in considerable, complex, and lengthy disruption to the potential detriment of court users. In addition, while the Committee's primary focus was on impacts to the public, the Committee recognized that larger geographic areas could pose disruptions for courts and justice system entities, such as increased travel times across a consolidated circuit and the need for interaction and coordination with additional local governments and law enforcement agencies.

The Committee noted a number of alternatives to consolidation that have been implemented, are in the process of being implemented, or could be implemented with sufficient resources to address the challenges identified during its assessment. These include:

- Funding in the fiscal year 2023-24 general appropriations act for salary increases for critical due process positions, which took effect July 1, 2023. Specifically, the Legislature funded targeted salary increases for court reporters, digital court reporters, court interpreters, trial court staff attorneys, and case managers, and this funding is already showing promise to help with recruitment and retention.

- Recommendations of the Judicial Management Council's Workgroup on Judicial Practices in the Trial Courts regarding "the implementation of procedures and other instructions by judges for practice within their individual courtrooms and [determining] whether such instructions are sufficiently accessible, understandable, and consistent with rules of court procedure and law."[117] In response, the Supreme Court amended Florida Rule of General Practice and Judicial Administration 2.215 as recommended by the Workgroup.[118]

---

[117] *In re: Workgroup on Judicial Practices in the Trial Courts*, Fla. Admin. Order No. AOSC21-57 (Nov. 9, 2021), https://supremecourt.flcourts.gov/content/download/802678/file/AOSC21-57.pdf.

[118] *In re: Amendments to Florida Rule of General Practice and Judicial Administration 2.215*, 48 Fla. L. Weekly S194 (Fla. Sept. 28, 2023).

- Judicial branch budget request for fiscal year 2024-25, which includes a number of issues designed to enhance the ability of courts to effectively and efficiently adjudicate cases, including court reporting, due process, case managers, and case management technology. Specifically, the trial courts are seeking funding for:
    - Additional stenographer and digital court reporting positions, as well as additional funding for related contractual services;
    - Court interpreter, expert witness, and senior judge resources;
    - Additional case managers to support effective case management and ensure that cases are processed timely; and
    - Ensuring that each judicial circuit has a foundational level of case management technology to view court documents and receive and respond to court filings.

- Management by chief judges and court administration of existing resources within a judicial circuit, such as temporary reassignment of judges based on vacancies elsewhere in the circuit.

In summary, the Committee finds that any potential benefits of consolidation would not outweigh the potential impact and disruption of consolidation, and that less disruptive adjustments exist to address the challenges discussed above.

### E. Misconceptions on Effects of Consolidation

The Committee separately notes some common misconceptions indicated in the survey responses. Many survey respondents expressed concerns that consolidation would increase caseloads and result in the closure of existing county courthouses, requiring people to drive longer distances to attend court as jurors or litigants.

However, the Committee determined that consolidation of judicial circuits would not affect caseloads, as the general statewide levels of criminal and civil filings would not change. This is true in part because of the second misconception, specifically that consolidation would somehow impact venue. Lawsuits may only be filed in a proper venue, which is based on, for example, the county where the crime occurred, the county where the cause of action accrued, or the county where the property in litigation is located.[119] Circuit consolidation would have no impact on the proper venue for legal proceedings.

Finally, consolidation of judicial circuits likely would not have resulted in the closure of courthouses. Doing so would only render judicial administration more inconvenient for members of the public, who have already invested

---

[119] *See, e.g.,* §§ 47.011, 47.021, 910.03, Fla. Stat (2023).

taxpayer funds in those facilities. Therefore, it is unlikely that consolidation would have required people to drive longer distances to attend court.

## F. Suggestions Beyond the Scope of the Charges

The Committee's extensive outreach and input efforts also yielded suggestions that went beyond the scope of its charges, as prescribed in Administrative Order No. AOSC23-35, which was limited to studying the specific issue of consolidating (i.e., reducing the number of) the state's judicial circuits. The Committee did not engage in any analysis of these suggestions and is not expressing a view on any of these suggestions, because these suggestions were not within the parameters of the Committee's charges.

# IV. Recommendation

The exercise of studying whether a need exists to consolidate Florida's judicial circuits proved to be worthwhile. Through this exercise, the Committee identified challenges affecting judicial circuits' operations and noted the potential benefit of uniformity that could be realized through consolidation. However, the Committee gave great weight to the opposition voiced by the majority of court users and justice system entities. The Committee concluded that consolidation was not a necessary solution to identified challenges nor necessary to produce uniformity. Reviewing input from members of the public and professionals who work in the court system, and analyzing myriad data on court operations, helped the Committee consider ways to improve services to court users and further the judicial branch's vision of accessible, fair, effective, responsive, and accountable justice.

After comprehensive review and careful consideration of the public comments, survey responses, written correspondence, and data, and in consideration of the criteria in Rule 2.241 and Administrative Order No. AOSC23-35, the Committee unanimously recommends no consolidation of judicial circuits. The Committee concludes that the potential adverse impacts and disruptive effects of consolidation significantly outweigh any potential benefits. As outlined in section III. of this report, the Committee also concludes that less disruptive adjustments exist to address challenges facing judicial circuits.

# Appendix

Analytical templates for all 20 judicial circuits.